Doris Cristina PIAMBA CORTES, Individually and as Personal Representative of the Estate of Maria Constanza Piamba Cortes, deceased, Plaintiff-Appellee-Cross-Appellant,

v.

AMERICAN AIRLINES, INC., a Delaware Corporation, Defendant-Appellant-Cross-Appellee.

No. 98-4739.

United States Court of Appeals,

Eleventh Circuit.

June 15, 1999.

Appeals from the United States District Court for the Southern District of Florida. (No. 96-727-CIV-SH), Shelby Highsmith, Judge.

Before BIRCH and DUBINA, Circuit Judges, and MORAN[*], Senior District Judge.

BIRCH, Circuit Judge:

In this appeal, we hold as a matter of first impression that Article 25 of the Warsaw Convention, as clarified by Montreal Protocol No. 4, requires a passenger to prove that an air carrier subjectively knew its conduct likely would result in harm to its passengers in order to escape the Convention's limitations on liability. On summary judgment, the district court held that Article 25 measures an air carrier's conduct objectively and concluded as a matter of law that, under either an objective or subjective standard, the passengers' claims for damages were not limited by Article 25's liability cap. For the reasons that follow, we conclude that the district court incorrectly entered summary judgment against the air carrier on this issue and remand for a determination by the finder of fact whether the air carrier's conduct precludes the application of the Convention's liability cap to this case.

In addition, we hold that the district court: (1) properly applied Florida compensatory damages law to this case; (2) properly refused to apply Florida's apportionment of liability statute; and (3) did not abuse its discretion during the damages trial by excluding evidence relating to the facts of the underlying plane

[*]Honorable James B. Moran, Senior U.S. District Judge for the Northern District of Illinois, sitting by designation.

crash and prohibiting reference to the legal finding of willful misconduct. We therefore affirm the judgment of the district court with respect to these issues.

## I. BACKGROUND

### *A. Facts*

On December 20, 1995, American Airlines Flight 965 ("Flight 965") crashed as the plane attempted to navigate its arrival to the Alfonso Bonilla Aragon airport in Cali, Colombia. The crash killed 151 passengers, including Maria Constanza Piamba Cortes, a domiciliary of Colombia who was returning home after studying in the United States. Appellee-Cross Appellant Doris Cristina Piamba Cortes ("Piamba Cortes"), acting both individually and as the personal representative of her sister Maria Constanza Piamba Cortes, filed a tort action against Appellant-Cross Appellee American Airlines, Inc. ("American").

The facts leading up to the crash are largely undisputed and have been detailed comprehensively by the district court. *See In re Air Crash Near Cali, Colombia on December 20, 1995,* 985 F.Supp. 1106, 1109-22 (S.D.Fla.1997). We need not duplicate the district court's detailed factual recitation; for purposes of our discussion, we set forth an abbreviated statement of facts that are relevant in resolving this appeal.

Flight 965 left Miami International Airport on the afternoon of December 20, 1995, bound for Cali. Captain Nicholas Tafuri and First Officer Donnie Ray Williams piloted the Boeing 757, which the parties agree was airworthy and in good mechanical and structural condition. At all material times during the flight, Williams flew the aircraft while Tafuri primarily handled radio communications. The Cali airport is located in a valley approximately forty-three miles long and twelve miles wide. The arrival and approach paths for aircraft landing at the airport are designed to keep planes in an "airway" in the center of the valley and away from the mountainous terrain that surrounds the valley.

American provides special training to its pilots who fly into Central and South America in order to acquaint them with the unusual features of these regions. Among other things, pilots are instructed, in no uncertain terms, not to rely on local air traffic controllers ("ATCs") for information about their location or position in the sky. According to American's training materials, Latin American ATCs will assume when

providing clearance that the pilot is on course, the plane is located where the pilot says it is, the pilot knows where the mountains are, and the pilot will refuse a clearance that will take the plane into a mountain. Because these assumptions may be incorrect, the ATCs will clear pilots to descend below minimum safe altitudes in mountainous areas.

American also instructs its pilots that they must continually verify their exact location by every means available; if they are unable to locate and cross-check their position or are otherwise unsure of where they are, they must suspend any descent of the airplane until their position is verified and the safe minimum altitude is determined. Furthermore, American teaches its pilots to insist on the complete published or assigned flight plan for the plane's approach to the airport unless the pilot is sure of the plane's location and the terrain below. If the plane is operating on an unpublished route, American's training materials and FAA regulations provide that "the pilot, when an approach clearance is received, shall maintain the last altitude assigned until the aircraft is established on a segment of the published route." *Id.* at 1129-30.

The flight plan assigned to Flight 965 called for the plane to follow a specified route during its arrival and approach to Cali. The arrival phase typically is conducted in accordance with a specified route that consists of a series of waypoints that define the path to the landing strip. In this case, the waypoints were marked by radio beacons known as "navaids," which emit radio waves that can be tuned in from the cockpit and allow the pilot to determine the compass direction to, and in some instances the distance to, the waypoint. The waypoints also may help a pilot establish the plane's position in the sky, as well as its distance to a certain point.

Based on data recovered from Flight 965's digital flight data recorder and the statements of Tafuri and Williams on the plane's cockpit voice recorder,[1] the parties have reconstructed the following events that led to the crash.

---

[1] The summary judgment record contains two transcriptions of the cockpit voice recorder. One version is based upon the work of an investigatory group of the National Transportation Safety Board. The second was prepared by an expert retained by American, and contains interpretations of the crew's statements at critical points during Flight 965's approach that are more favorable to American. When making its factual findings, the district court relied exclusively on the second transcription prepared by American's expert. We therefore will do the same.

Flight 965 approached Cali at night. Originally, Flight 965 was assigned a published arrival path to Cali that called for the plane to fly over the "Tulua" waypoint, located approximately thirty-four miles northeast of the airport, proceed to the "D21 CLO" waypoint, and then fly over the "Rozo" waypoint, which is located approximately three miles north of the airport. From there, the arrival path called for the plane to continue south to the "Cali" waypoint, located nine miles south of the airport, and, after executing a 180-degree turn, return north to the airport and land.

When Flight 965 was approximately fifty-four miles north of the airport, the ATC stationed in Cali cleared the plane to the Cali waypoint and instructed the pilots to descend and maintain 15,000 feet and to "report uh, Tulua." *Id.* at 1117. Moments later, however, the Cali ATC offered the pilots the option of landing straight onto the runway without having to turn the plane around at the Cali waypoint. The pilots accepted the offer, and thus accepted a published flight route that began at the Tulua waypoint, proceeded to the Rozo waypoint, and ended at the runway.

After accepting the offer, the cockpit voice recorder suggests that Williams erroneously believed the flight route began at the Rozo waypoint instead of the Tulua waypoint. Tafuri told Williams that the flight route began at the Tulua waypoint, but then asked the ATC for permission to go "direct to Rozo and then do the Rozo arrival," a request that set in motion a chain of events that culminated in the crash. *Id.* at 1118. The ATC responded by saying, "Affirmative," but added instructions to "take the Rozo One" approach and to "report Tulua at twenty-one miles and five thousand feet." *Id.* at 1119.[2]

After this exchange, one of the pilots sought to program the flight management computer ("FMC") to fly automatically to the Rozo waypoint by typing the letter "R" into the FMC's keypad. A total of twelve waypoints appeared on the FMC screen, the first of which was for the "Romeo" waypoint, located

_____

[2]The parties disagreed about what Tafuri and Williams would have understood by the term "direct." According to Piamba Cortes and the passengers' representatives, Latin American ATCs use "direct" to mean "direct along the published route," and that Tafuri and Williams received training as to this fact. The district court concluded, however, that evidence adduced by American created a question of fact whether Tafuri and Williams understood the ATC's use of the word "direct" to mean "direct along the published route" or "direct to the specified waypoint." *See In re Air Crash Near Cali,* 985 F.Supp. at 1117 & n. 8, 1119.

approximately 132 miles to the northeast of the plane. Although the pilots were required to verify that the chosen waypoint was actually Rozo, the pilot did not verify the Rozo waypoint and instead selected the Romeo waypoint. The FMC immediately began to fly the plane in the direction of the Romeo waypoint, sending the plane on a prolonged, and pronounced, turn to the left, toward the east and toward the mountains.

At the time the plane began turning, it was descending past an altitude of 16,880 feet and was flying adjacent to, or slightly to the southwest of, the Tulua waypoint. During the turn east, Tafuri told Williams that he wished the plane to fly to the Tulua waypoint, but instead of dialing the proper frequency for the Tulua waypoint (117.7) into his electronic horizon situation indicator ("EHSI"), Tafuri unwittingly dialed 116.7, the frequency for a different waypoint located 160 miles to the east of the valley. Consequently, the course deviation indicator ("D-bar") function of his EHSI indicated that the Tulua waypoint was located to the left of the plane. Tafuri, however, instructed Williams to turn back toward the right, which sent the plane in a westerly direction and back toward the valley. At that time, the plane was south of the Tulua waypoint, well to the east of the valley, and east of the radials that define the flight route to the Rozo waypoint. The plane also had continued its descent, dropping more than 5,000 feet since the "R" had been entered into the FMC.

Less than one minute later, Tafuri dialed 117.7, the correct frequency for the Tulua waypoint, into his EHSI. Because the plane already had passed the Tulua waypoint, this caused the D-bar indicator to shift on the EHSI screen. Tafuri instructed Williams to fly to the Cali waypoint, although he also confirmed with the ATC that the flight plan called for the plane to fly first to the Tulua waypoint and then to the Rozo waypoint. Tafuri commented to Williams that he was having difficulty locating the Tulua waypoint, so Williams suggested that they intersect with the flight route and fly directly to the Rozo waypoint.

At that time, the plane had descended to 10,000 feet and was still heading west. When the plane dropped to 8,480 feet, the plane's ground proximity warning system sounded, directing the pilot to pull up. Williams attempted to climb, but the plane's ability to climb rapidly was hampered by the fact that Tafuri and Williams failed to pull back the speed brakes, which had been deployed several minutes earlier.

Approximately thirty seconds later the plane crashed near the summit of El Deluvio, a peak located approximately twenty-four miles northeast of the airport and approximately ten miles east of the airway.

*B. Procedural History*

After Piamba Cortes filed suit in Florida state court, American removed the case to federal court where it was consolidated for multidistrict pretrial proceedings with almost 160 other passenger lawsuits. Piamba Cortes, through the Plaintiffs' Steering Committee, filed a motion for partial summary judgment on the issue of American's liability. After a four-day hearing on the motion, the district court granted the motion.

In a 118-page order granting the plaintiffs' motions for summary judgment, the district court concluded that all the passengers' suits against American fell under the terms of the Warsaw Convention. According to the language in effect at the time the district court entered its order, the Convention limited an air carrier's liability except in cases of "willful misconduct." The district court concluded that Eleventh Circuit law allows a passenger to establish willful misconduct in three ways, one of which is defined as "reckless disregard of the consequences." *In re Crash Near Cali,* 985 F.Supp. at 1127. Noting that all the passengers' representatives proceeded under a reckless disregard theory, the district court further concluded that reckless disregard contemplates a "rigorous objective inquiry" that is satisfied "by showing that the defendant's conduct amounted to an extreme deviation from the standard of care under circumstances where the danger of likely harm was plain and obvious," even if the defendant did not subjectively realize that its conduct placed its passengers at significant risk of harm. *Id.* at 1128, 29. Upon reviewing the evidence, the district court held that no reasonable jury could find that Tafuri and Williams' conduct—in particular, the decision to continue descending at night in mountainous terrain when the circumstances made clear that the plane had strayed dramatically from the published arrival route—amounted to anything less than willful misconduct. *Id.* at 1138. The district court reached this conclusion by applying its objective analysis for reckless disregard, although the court held in the alternative that, even if reckless disregard contemplates a subjective test, the evidence compelled a conclusion that Tafuri and Williams engaged in willful misconduct.

After entering summary judgment in Piamba Cortes' favor on the issue of liability, the district court conducted a trial on the issue of damages. Although Piamba Cortes' sister was a domiciliary of Colombia, the district court's conflict-of-laws analysis concluded that Florida compensatory damages law determined the elements of compensatory damages awarded to Piamba Cortes. In addition, the district court held that, under the Convention, American is liable for all compensatory damages and thus Florida law requiring the apportionment of liability did not apply. Finally, the district court ruled that, during the damages trial, Piamba Cortes could not introduce the factual circumstances of the crash and could not mention the court's finding that the conduct of Flight 965's pilots constituted willful misconduct.

American appeals three issues, arguing that: (1) "willful misconduct" requires a subjective rather than an objective test, and the evidence creates a question of fact for the jury under this test; (2) conflict-of-laws principles warrant the application of the compensatory damages scheme used by the decedent's domicile, which in this case is Colombia; and (3) the Convention operates as a "pass-through" on the issue of damages, and thus the district court should have applied Florida's apportionment statute. Piamba Cortes cross-appeals, arguing that, during the trial on damages, she should have been able to introduce the facts of the crash and inform the jury that Flight 965's pilots had engaged in willful misconduct as a matter of law. We consider each argument in turn.

## II. WARSAW CONVENTION

American raises two distinct arguments related to the Warsaw Convention. First, American argues that the district court erroneously construed "willful misconduct" under the Convention to create an objective rather than a subjective test. Second, American argues that, if the subjective test is applied, a question of fact exists whether the conduct of Flight 965's pilots constitutes willful misconduct, and therefore the entry of summary judgment on the issue of liability was inappropriate.

The first issue requires us to determine whether the district court properly construed the terms of a treaty, which is a question of law that we review *de novo. See Yapp v. Reno,* 26 F.3d 1562, 1565 (11th Cir.1994).

*A. Background of the Warsaw Convention*

The Warsaw Convention is the commonly used name for the Convention for the Unification of Certain Rules Relating to International Transportation by Air, T.S. No. 876, 137 L.N.T.S. 11, *reprinted in* note following 49 U.S.C.App. § 1502 (1988) (hereinafter "Warsaw Convention"), which entered into force for the United States on October 29, 1934. *See Butler v. Aeromexico,* 774 F.2d 429, 430 n. 1 (11th Cir.1985). The Convention is the product of two international conferences, the first held in Paris in 1925 and the second in Warsaw in 1929. *See generally Floyd v. Eastern Airlines, Inc.,* 872 F.2d 1462, 1467-69 (11th Cir.1989) (providing overview of the history, policies, and goals of the Warsaw Convention), *rev'd on other grounds,* 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). The Convention applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire." Warsaw Convention art. 1(1).

Under Article 17 of the Convention, air carriers are "liable for damage sustained in the event of the death or wounding of a passenger ... if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Warsaw Convention art. 17. The Convention thus "established a presumption that air carriers are liable for damage sustained by passengers as a result of the carrier's negligent conduct." *Floyd,* 872 F.2d at 1467. In exchange for this presumption of liability, the drafters included a limitation on the amount of damages a passenger could recover from the carrier: 125,000 gold francs, or approximately $8,300. *See* Warsaw Convention art. 22; *see also Floyd,* 872 F.2d at 1467.

As a companion provision to the liability cap contained in Article 22, the drafters adopted a safety valve by which passengers could escape the liability cap if they established that the air carrier's conduct that caused their injuries constituted "wilful misconduct."[3] Warsaw Convention art. 25(1). Specifically, Article 25(1) provided that:

> The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part

---

[3]This term is more commonly spelled today as "willful misconduct." We use the modern spelling in this opinion except for direct quotations.

as, in accordance with the law of the court to which the case is submitted, is considered to be the equivalent to wilful misconduct.

*Id.* Consequently, in order to obtain any compensatory damages over $8,300 under the original version of the Convention, a passenger had to establish that his or her damages were the result of the air carrier's willful misconduct.

The $8,300 liability cap created by Article 22 proved to be a source of great dissatisfaction, particularly in the United States. *See Floyd,* 872 F.2d at 1468-69. In 1955, a conference similar to the 1929 conference in Warsaw convened at the Hague, during which delegates drafted what is known as the Hague Protocol. *See* Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 (hereinafter "Hague Protocol"), *reprinted in* Lawrence B. Goldhirsch, The Warsaw Convention Annotated 265-74 (1988) (hereinafter "Goldhirsch"). The Hague Protocol proposed to double the liability limit contained in Article 22 to 250,000 gold francs, or approximately $16,600. *See* Hague Protocol art. XI, *reprinted in* Goldhirsch at 268; *see also Floyd,* 872 F.2d at 1468. In addition, delegates proposed deleting the term "willful misconduct" from Article 25 and replacing it with language that would allow a passenger to escape Article 22's liability cap only if "it is proved that the damage resulted from an act or omission ... done with intent to cause damage or recklessly and with knowledge that damage would probably result." Hague Protocol art. XIII, *reprinted in* Goldhirsch at 269. The Senate, however, refused to ratify, and the President did not adhere to, the Hague Protocol.

The rejection of the Hague Protocol by the United States prompted the execution of the Montreal Agreement of 1966, in which air carriers agreed to enter into private contractual agreements with all passengers (created by the purchase of a ticket) to raise the liability limit to $75,000 for all international flights originating, terminating, or having a connecting point in the United States.[4] Agreement CAB 18900, *approved by* Civil Aeronautics Board Order No. E-28680, May 13, 1966, 31 Fed.Reg. 7302 (1966).

---

[4] Article 22(1) of the Warsaw Convention provides that "by special contract, the carrier and the passenger may agree to a higher limit of liability." Warsaw Convention Art. 22(1). Pursuant to the Montreal Agreement, the air carriers amended their contracts of carriage, applicable to the United States, by filing tariffs raising the limit of liability for passenger injury and death to $75,000. *See* 14 C.F.R. § 203.4 (1998).

The execution of the Montreal Agreement set the stage for a concerted effort to update the terms of the Convention to reflect modern legal and technological standards. At another conference in Guatemala City in 1971, delegates proposed raising the liability cap to approximately $136,000. *See* Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at the Hague on 28 September 1955 ("the Guatemala City Protocol"), *reprinted in* Goldhirsch at 319-29. In 1975, delegates met once again in Montreal, Canada, and adopted a series of four protocols, known collectively as the Montreal Protocols. *See* Goldhirsch at 331-62 (reprinting the four Montreal Protocols). During the twenty years following the 1975 Montreal conference, the United States declined to ratify either the Guatemala City Protocol or the Montreal Protocols.

On September 28, 1998, the Senate ratified the fourth of the Montreal Protocols ("Montreal Protocol No. 4") independently of the Guatemala City Protocol and the three other Montreal Protocols, and the President signed the instrument of ratification on November 5, 1998. *See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* --- U.S. ----, ----, 119 S.Ct. 662, 674 & n. 14, 142 L.Ed.2d 576 (1999). Montreal Protocol No. 4 replaces the term "willful misconduct" in Article 25 with the same language as contained in the Hague Protocol:

> [t]he limits of liability specified in ... Article 22 shall not apply if it is proved that the damage resulted from an act or omission of the carrier, his servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result.

Additional Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at the Hague on 28 September 1955 ("Montreal Protocol No. 4") art. IX, *reprinted in* Goldhirsch at 358.[5]

---

[5]In 1994, the International Air Transport Association ("IATA") launched an initiative for its member airlines to waive, by private contractual agreement, the liability cap contained in Article 22 of the Convention. *See* Thomas J. Whalen, Update on the IATA Intercarrier Agreement, 13 Air & Space Law. 1, 18 (1998). The IATA drafted what is known as the IATA Intercarrier Agreement on Passenger Liability, which imposes strict liability upon carriers for damages of up to approximately $130,000, but allows a carrier to exculpate itself from liability over this amount if it proves that "[the carrier and its agents] have taken all necessary measures to avoid the damage or that it was impossible for [the carrier and its agents] ... to take such measures." *See id.* at 18-19; *see also* 144 Cong. Rec. S11059-02, S11060 (Sept. 28, 1998) (statement of Lee S. Kreindler). Under the IATA's system, the willful misconduct exception of Article 25—or, more recently, the exception as clarified by Montreal Protocol No. 4—is

*B. Application of Montreal Protocol No. 4 to This Case*

During the district court proceedings, Piamba Cortes' ability to recover more than $75,000 hinged upon establishing that the pilots of Flight 965 engaged in willful misconduct under Article 25, thus allowing Piamba Cortes to avoid the limitations on liability contained in Article 22. While this case was on appeal, however, the United States' adherence to Montreal Protocol No. 4 changed the language used in Article 25 to measure such conduct. Montreal Protocol No. 4 specifies that it will enter into force in a ratifying jurisdiction ninety days after the instrument of ratification is deposited with the Polish government. *See* S. Exec. Rep. 105-20, at 4 (1998). As a result, the Protocol entered into force in the United States on March 4, 1999. *See Tsui Yuan Tseng,* --- U.S. at ---- n. 14, 119 S.Ct. at 674 n. 14. We therefore must determine whether the new language contained in Montreal Protocol No. 4 applies to this case. We first look to see whether the amendment effects a substantive change in the legal standard or merely clarifies the prior law. As we explain, if the amendment clarifies prior law rather than changing it, no concerns about retroactive application arise and the amendment is applied to the present proceeding as an accurate restatement of prior law.

At first, it seems intuitively appealing to conclude that, because the new language significantly alters the text of the original Convention, the original Convention's language may be presumed to have meant the opposite. For example, Montreal Protocol No. 4's language includes an express requirement that the air carrier must know that damage probably will result from its conduct, so one might conclude that such a requirement was omitted from the original Convention. This intuition runs contrary to our precedent, however, which holds that an amendment containing new language may be intended "to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases. Thus, an amendment ... does not

---

rendered irrelevant, because the carrier has contractually agreed to pay all a passenger's damages over $130,000 unless the carrier can show it took all necessary measures to avoid the damages. *See* S. Exec. Rep. No. 105-20, at 6, 13 (1998). The Department of Transportation approved the IATA Intercarrier Agreement on November 12, 1996. *See* D.O.T. Order 96-11-6 (D.O.T. Nov. 12, 1996). As of April 5, 1998, fifty-one domestic and foreign air carriers had adhered to the IATA Intercarrier Agreement, including American. *See* S. Exec. Rep. No. 105-20, at 57. The parties have not argued that the IATA Intercarrier Agreement applies retroactively to this case, and we therefore do not consider the issue.

necessarily indicate that the unamended statute meant the opposite" of the language contained in the amendment. *United States v. Sepulveda,* 115 F.3d 882, 885 n. 5 (11th Cir.1997).

Moreover, concerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit is deemed to clarify relevant law rather than effect a substantive change in the law. *See Beverly Community Hosp. Ass'n v. Belshe,* 132 F.3d 1259, 1265 (9th Cir.1997), *cert. denied,* --- U.S. ----, 119 S.Ct. 334, 142 L.Ed.2d 276 (1998); *Liquilux Gas Corp. v. Martin Gas Sales,* 979 F.2d 887, 890 (1st Cir.1992); *Boddie v. American Broadcasting Cos.,* 881 F.2d 267, 269 (6th Cir.1989); *cf. Tsui Yuan Tseng,* --- U.S. at ----, 119 S.Ct. at 667-68 (concluding that a provision in Montreal Protocol No. 4 limiting recovery for bodily injuries clarifies, but does not change, prior law under the Convention). In effect, the court applies the law as set forth in the amendment to the present proceeding because the amendment accurately restates the prior law. *See Liquilux,* 979 F.2d at 890 ("Clarification, effective *ab initio,* is a well recognized principle.").

Several factors are relevant when determining if an amendment clarifies, rather than effects a substantive change to, prior law. A significant factor is whether a conflict or ambiguity existed with respect to the interpretation of the relevant provision when the amendment was enacted. If such an ambiguity existed, courts view this as an indication that a subsequent amendment is intended to clarify, rather than change, the existing law. *See Liquilux,* 979 F.2d at 890. Second, courts may rely upon a declaration by the enacting body that its intent is to clarify the prior enactment. *See id.* Courts should examine such declarations carefully, however, especially if the declarations are found in the amendment's legislative history rather than the text of the amendment itself. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980). As a general rule, "[a] mere statement in a conference report of [subsequent] legislation as to what the Committee believes an earlier statute meant is obviously less weighty" than a statement in the amendment itself. *Id.; see also Pennsylvania Med. Soc'y v. Snider,* 29 F.3d 886, 900 (3d Cir.1994) (attributing no value to a House committee report stating that an amendment clarifies prior law when the statement is inconsistent with a logical reading of the earlier version of the statute and with

the legislative history of the earlier statute).  Declarations in the subsequent legislative history nonetheless may be relevant to this analysis, especially if the legislative history is consistent with a reasonable interpretation of the prior enactment and its legislative history.  *See Sykes v. Columbus & Greenville Ry.,* 117 F.3d 287, 293-94 (5th Cir.1997) ("Although a committee report written with regard to a subsequent enactment is not legislative history with regard to a previously enacted statute, it is entitled to some consideration as a secondarily authoritative expression of expert opinion.") (quoting *Bobsee Corp. v. United States,* 411 F.2d 231, 237 n. 18 (5th Cir.1969));  *SEC v. Clark,* 915 F.2d 439, 451-52 (9th Cir.1990) ("While a statement concerning an earlier statute by members of a subsequent legislature is of course not conclusive evidence of the meaning of the earlier statute, the later interpretation may be accorded some deference where the subsequent legislative commentary accompanies the enactment of an amendment to the earlier law.");  *cf. GTE Sylvania,* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13 (noting that such history is "sometimes considered relevant," but "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment").

*1. Ambiguities and Conflicting Interpretations of Article 25*

We first examine whether a conflict or ambiguity existed with respect to the application of Article 25 as originally enacted.  The English translation of Article 25 allowed a passenger to avoid the liability cap if he could establish that the injury resulted from willful misconduct by the air carrier.  We announced the Eleventh Circuit's test for willful misconduct in *Butler.*  774 F.2d at 430.  Adopting a test used by the District of Columbia Circuit, we held that willful misconduct "mean[s] 'the intentional performance of an act with knowledge that the ... act will probably result in injury or damage' or 'reckless disregard of the consequences' or 'a deliberate purpose not to discharge some duty necessary to safety.' "  *Id.* (quoting *Koninklijke Luchtvaart Maatschappij N.V. v. Tuller,* 292 F.2d 775, 778-79 (D.C.Cir.1961)).

*Butler* thus identifies three alternative ways to prove willful misconduct:  (1) intentional performance of an act knowing that the act likely would result in injury or damage;  (2) an action taken with "reckless disregard" of the consequences;  or (3) a deliberate failure to discharge a duty necessary to safety.  774 F.2d

at 430. The first prong questions whether the carrier subjectively realized at the time of the relevant action that this action was likely to result in injury or damage to its passengers. The second prong is less precise, requiring that an air carrier "recklessly disregarded" the consequences of its acts. Without offering further explanation of the meaning of the term "reckless disregard,"[6] we held that the facts in *Butler* established that the defendant's pilot had recklessly disregarded the likelihood that his conduct would cause a plane crash and therefore had engaged in willful misconduct. *Id.* at 431-32.

In other Eleventh Circuit precedent, the term of art "reckless disregard" has different meanings depending on the context in which it is used. For example, when examining whether an individual willfully failed to pay withholding taxes, reckless disregard requires "something less than actual knowledge" of a risk. *Malloy v. United States,* 17 F.3d 329, 332 (11th Cir.1994). In libel law, on the other hand, reckless disregard requires a showing that a defendant in fact knew that a published statement might be false. *See Meisler v. Gannett Co., Inc.,* 12 F.3d 1026, 1030 (11th Cir.1994) (" 'Reckless disregard,' for purposes of proving actual malice, is shown if the defendant entertained serious doubts as to the truth of his publication.") (internal quotation marks omitted). We therefore find little guidance under *Butler* and other Eleventh Circuit precedent as to the precise meaning of reckless disregard in the context of cases filed under the Convention.

A similar lack of clarity exists in our sister circuits when applying the term "willful misconduct" in Warsaw Convention cases. Despite the fact that all circuits to address the issue have used the term "reckless disregard" when applying Article 25, *see, e.g., Shah v. Pan Am. World Servs., Inc.,* 148 F.3d 84, 93 (2d Cir.1998) (carrier must have acted either (1) with knowledge that its actions would result in injury or death, or (2) in conscious or reckless disregard of the fact that death or injury would be the probable consequences of its actions), *cert. denied,* --- U.S. ----, 119 S.Ct. 1033, 143 L.Ed.2d 42 (1999); *Koirala v. Thai Airways*

---

[6]The district court in *Butler,* in addition to finding that the air carrier engaged in willful misconduct as defined in Article 25, also pointed out "as a second string to its bow ... that if it were needful to resort to local law, the Alabama concept of 'wantonness' was substantially equivalent to the Convention's primary standard" for willful misconduct. *Butler,* 774 F.2d at 430-31. We hypothesized in *dicta* that, to the extent that Alabama's test for wantonness differed from the Convention's test for willful misconduct, the air carrier suffered no harm such that the case must be reversed. *Id.* at 431. We did not, as American suggests, hold that the test for willful misconduct under Article 25 is equivalent to the Alabama standard for wantonness.

*Int'l, Ltd.,* 126 F.3d 1205, 1209-10 (9th Cir.1997) (air carrier must intentionally perform an act, or fail to perform an act, with knowledge that it probably will result in injury or harm, or intentionally performed an act in some manner as to imply a reckless disregard of the consequences of its performance); *Saba v. Compagnie Nationale Air France,* 78 F.3d 664, 666 (D.C.Cir.1996) (same); *In re Air Crash Disaster,* 86 F.3d 498, 544 (6th Cir.1996) (same), the courts have employed a "know-it-when-we-see-it" approach rather than articulating precisely what is meant by reckless disregard. *See, e.g., Saba,* 78 F.3d at 667 (stating that, although the D.C. Circuit clearly has equated willful misconduct with reckless disregard, the court "never ha[s] been very clear as to what we meant by reckless disregard"); *see also* Perry S. Bechky, Mismanagement and Misinterpretation: U.S. Judicial Implementation of the Warsaw Convention in Air Disaster Litigation, 60 J. Air L. & Com. 455, 501-02 (1995) (U.S. courts have "grappled" with question whether reckless disregard envisions a subjective or objective test, but have "generally regarded 'willful misconduct' as equivalent to recklessness or gross negligence").

Notwithstanding the fact that courts have avoided precise definitions of reckless disregard in Warsaw Convention cases, it is possible to make inferences regarding the analysis the courts employed in their decisions. For example, in 1961 the District of Columbia Circuit upheld multiple findings of willful misconduct based on a theory of reckless disregard without finding that the air carrier or its pilots subjectively knew that their conduct likely would harm passengers. *See Tuller,* 292 F.2d at 779-80.[7] The Second Circuit, on the other hand, admonished a district court for "concluding that the Second Circuit does not require knowledge that damage would probably result" when assessing willful misconduct under a theory of reckless disregard. *See Berner v. British Commonwealth Pac. Airlines, Ltd.,* 346 F.2d 532, 536 (2d Cir.1965). The *Berner* court further observed that "[t]here must be a realization of the probability of injury from the conduct, and a disregard of the probable consequences of such conduct." *Id.* at 537 (quoting *Grey v. American Airlines, Inc.,* 227 F.2d 282, 285 (2d Cir.1955)). Later Second Circuit opinions continue to require a showing that the carrier knew that its actions placed its passengers at risk. *See, e.g., Republic Nat. Bank v. Eastern*

---

[7]The district court insightfully discussed the *Tuller* opinion in its order, *see In re Crash Near Cali,* 985 F.Supp. at 1128 & n. 15, and we adopt this discussion for the purposes of our analysis here.

*Airlines, Inc.,* 815 F.2d 232, 239 (2d Cir.1987) ("factors must be established indicating that such a loss is likely to occur and that defendant was aware of the probability").

The opinion that has attracted the most recent attention in this area is *Saba,* in which the District of Columbia Circuit endeavored to clarify the ambiguity surrounding that circuit's definitions of reckless disregard and willful misconduct. *Saba* adopts a definition of willful misconduct that is the same in all practical respects as the definitions adopted in *Tuller* and *Butler:* "[w]illful misconduct is the intentional performance of an act with knowledge that the act will probably result in an injury or damage, or in some manner as to imply reckless disregard of the consequences of its performance." 78 F.3d at 666. The district court in *Saba* concluded that the carrier engaged in willful misconduct by recklessly disregarding an obvious risk—specifically, the possibility that inadequate packing procedures would expose cargo to water damage when the cargo was left outside in the rain. *Id.* at 670. The circuit court reversed, holding that reckless disregard cannot be based solely upon a finding that the risk was obvious. *Id.* at 669-70. Rather, the plaintiff must prove that the carrier subjectively knew that the carpets would be exposed to rain or that the packing procedures used would create a grave risk of water damage to the cargo if it rained. *Id.* at 670.

The District of Columbia Circuit labeled this analysis a subjective test because it "requires a showing of a subjective state of mind." *Id.* at 668. The court acknowledged that the carrier's subjective state of mind may be established solely by inferences taken from circumstantial evidence; the inferences thus act as "a legitimate substitution for intent to do the proscribed act because, if shown, it is a proxy for that forbidden intent." *Id. Saba* 's test thus is satisfied if evidence allows an inference that the carrier "must have been aware" of a risk created by its conduct. *Id.* at 669. The court observed that its test is more stringent than an objective test that inquires only if the carrier "should have known" about the danger, because the test cannot be satisfied by showing merely "an extreme departure from standards of ordinary care." *Id.*

The holdings of *Saba, Berner,* and *Tuller* thus are not readily reconcilable and do not provide a clear definition of what is meant by reckless disregard in Convention cases. An examination of the interpretations of willful misconduct by other countries that are signatories to the Warsaw Convention reveals a lack of

uniformity similar to that contained in United States case law. *Cf. Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S. 217, 226, 116 S.Ct. 629, 634, 133 L.Ed.2d 596 (1996) ("Because a treaty ratified by the United States is not only the law of this land, [cit.], but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation ... the post-ratification understanding of the contracting parties."). According to one collection of case law interpreting the Warsaw Convention, foreign jurisdictions have adopted both subjective and objective tests for willful misconduct, with France, Germany, Greece, and Korea adopting objective tests and Switzerland adopting a subjective test. *See* Goldhirsch at 121 (collecting cases).[8]

This brief discussion addresses only a handful of the published cases that have construed willful misconduct under Article 25. Even this limited review, however, reveals a body of law that frequently is inconsistent and that provides a vague and nebulous definition of willful misconduct, rendering it difficult to apply. Under these circumstances, this ambiguity supports a conclusion that Montreal Protocol No. 4 clarifies, rather than effects a substantive change to, Article 25.

*2. Declarations of Intent Concerning Montreal Protocol No. 4*

Montreal Protocol No. 4 contains no statements concerning an intent to clarify or change prior law. We therefore will examine the drafting and legislative history of the amended language to discern the intentions behind enacting the amendment. As we have explained, Montreal Protocol No. 4 adopts the Hague Protocol's substituted language for Article 25; we therefore will look first to the drafting history of the Hague Protocol, where the negotiations surrounding the adoption of this language occurred.

The delegates at the 1955 Hague Conference began their deliberations with a draft proposal that narrowed Article 25 to allow unlimited liability only where the carrier committed a "deliberate act or omission ... done with intent to cause damage." ICAO Doc. 7686 LC/140, Vol. II, Documents 99 (1956). The Norwegian delegation proposed an amendment to Article 25 that would force the carrier to bear unlimited liability if "the act or omission was committed either with the intention to cause damage or recklessly by not

---

[8]Goldhirsch observes—without citing any cases—that the objective test is "the one usually applied" in United States courts when assessing claims of willful misconduct. *See* Goldhirsch at 121.

caring whether or not damage was likely to result." *Id.* at 174. The Norwegian delegate explained this language to mean that "the person in question *understood that there might be damage caused by his act or omission,* but, nevertheless, he took the position of saying: 'I am quite indifferent as to whether damage will occur or not.' " ICAO Doc 7686-LC/140 Vol. I, Minutes 196 (1956) (hereinafter "Hague Conference Minutes") (emphasis added). Other countries interpreted the proposal the same way. *See id.* at 194-96 (statements of Spanish and British delegates).

The Dutch delegation observed that, if the delegates intended to include a requirement that the carrier subjectively realize that damage likely would result from its actions, the Norwegian proposal's failure to specify the requirement expressly left the proposal open to the same interpretive problems encountered with the language used in the original Convention. *See id.* at 197-98. The Dutch delegation thus proposed replacing the phrase "not caring whether or not damage was likely to result" with the phrase "with full realization of the reckless character of his or their conduct and of the danger that damage would result." *Id.* at 198. After several other delegates concurred with the Dutch proposal, the conference finally adopted the phrase "with knowledge that damage would probably result." *See id.* at 198-206. Significantly, both the Norwegian proposal and the final adopted language reflected an effort to retain the same standard of conduct that had been adopted under the text of the Convention. *See id.* at 196 (statement by British delegate that "[o]ne of the most important elements in cases decided by courts on the Warsaw Convention was that it must be shown that the servants or agents of the operator ... had knowledge of the probable consequences of their acts"); *id.* at 197 (statement by United States delegate that the proposed alteration to Article 25, "although different in drafting from the text of the present Article 25, continued as nearly as possible to establish the same rules of law as existed in American jurisprudence").[9]

---

[9]In fact, Nathan Calkins, the United States' delegate to the Hague Conference, wrote that:

> While the revised [Article 25] is believed to be substantially a paraphrase of the present Article 25 as it is administered by United States courts, there appears to be no doubt that it considerably tightens the article as it is now currently administered in certain foreign courts. Some foreign countries presently regard gross negligence as sufficient to bring this article into play. [Application of the revised language] would bring about the result of maintaining substantially the same rule of law as is presently applied in courts within

We next turn to the legislative history surrounding the United States' adherence to Montreal Protocol No. 4, which supports this interpretation. According to a report prepared by the Senate Committee on Foreign Relations, the language that replaces willful misconduct in Article 25 "does not modify the scope of the standard ... [but rather serves as] a clarifying response to the difficulties that arose from differing translations of the text" of the original Convention. S. Exec. Rep. No. 105-20, at 15 (1998). In the view of the Senate Committee, the Protocol replaces the term "willful misconduct" with "the common law definition of 'willful misconduct.' " *Id.*

The State Department, in response to questions from members of the Senate Committee, explained further that the language contained in Montreal Protocol No. 4 "is merely an alternative interpretation of the original French text [of the Convention], developed to harmonize the various legal interpretations that had developed from the original." *Id.* at 47. Use of the term "willful misconduct" in the original Convention resulted, in the State Department's view, in a:

> discrepancy between common and civil law concerning the nature of conduct required to remove limits on liability. Because the concept of willful misconduct came to have different connotations in the civil and common law systems, the drafters [of the amended language] ... replaced the legal standards with a description of the conduct itself.

*Id.* The State Department therefore concluded that "this change does not modify the scope of the standard," *id.,* and that "the amendment to Article 25 will have no practical effect on the rights of claimants in cases under the Warsaw Convention." *Id.* at 53.

The Senate Committee and State Department premised their views upon the express requirement in Montreal Protocol No. 4 that a passenger must prove that the carrier knew its conduct would likely result in damage. Among other things, the Senate report quotes two Second Circuit opinions that require passengers seeking to establish willful misconduct to prove knowledge on the part of the carrier that injury likely will result from its actions. *See* S. Exec. Rep. 105-20, at 53 (quoting *Pekelis v. Transcontinental & W. Air, Inc.,*

_____

the United States....

G. Nathan Calkins, Grand Canyon, Warsaw and the Hague Protocol, 23 J. Air L. & Com. 253, 266-67 (1956).

187 F.2d 122 (2d Cir.1951), and *Grey v. American Airlines, Inc.,* 227 F.2d 282 (2d Cir.1955)).  In fact, in

*Grey,* the Second Circuit emphasized that "[t]here must be a realization of the probability of injury from the

conduct, and a disregard of the probable consequences of such conduct."  227 F.2d at 285.[10]

In sum, the Senate Committee and the State Department concluded that Article 25 always has

required a passenger to prove knowledge on the part of the air carrier that its conduct would likely result in

damage, and that Montreal Protocol No. 4 clarifies the existing law to codify expressly this requirement.  We

pay close attention to this conclusion, as "[r]espect is ordinarily due the reasonable views of the Executive

Branch concerning the meaning of an international treaty." *Tsui Yuan Tseng,* --- U.S. at ----, 119 S.Ct. at 671.

At the same time, we are mindful of the admonition that subsequent legislative history purporting to clarify

prior law should be viewed skeptically if it is inconsistent with a reasonable interpretation of the text and

legislative history of the earlier enactment.  *See GTE Sylvania,* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n.

13. We therefore will examine the language and drafting history of the original Convention to ensure that the

subsequent declarations of intent are consistent with the earlier law.

The delegates to the 1929 Warsaw conference drafted the Convention in French, and used the word

"dol" to describe the level of misconduct that allows a passenger to bypass Article 22's liability cap.[11]

---

[10]The Senate Report also quotes the Restatement (Second) of Torts' definition of reckless disregard, which does not require that an actor subjectively realize that his conduct is placing others at risk of harm. *See* S. Exec. Rep. 105-20, at 53 (quoting Restatement (Second) of Torts § 500 (1965) (actor is liable if he performs an act or fails to perform an act "knowing *or having reason to know* of facts which would lead a reasonable man to realize" that his conduct creates an unreasonable risk of harm and is substantially greater than is necessary to make his conduct negligent) (emphasis added)).  We are unable to explain the inclusion of this citation in the Senate Report, as the Restatement's definition is impossible to square with the express language used in Montreal Protocol No. 4 and the remaining discussion contained in the Report.  Under these circumstances, we cannot conclude that the citation is intended to contradict the express language of the Protocol and create an objective test under Article 25.

[11]The authentic French text of Article 25(1) states:

> Le transporteur n'aura pas le droit de se prévaloir des dispositions de la présente Convention qui excluent ou limitent sa responsabilité, si le dommage provient de son dol ou d'une faute qui, d'après la loi du tribunal saisi, est considérée comme équivalente au dol.

Goldhirsch at 193.

Although the term "dol"has "no precise analogue in the English language," Second International Conference on Private Aeronautical Law, Oct. 4-12, 1929, Warsaw, Minutes at v. (Robert C. Horner & Didier Legrez trans.1975) (hereinafter "Warsaw Minutes"), "[i]t implies an act or omission that was done intentionally to cause a harm." Goldhirsch at 121. The use of the word "dol" resulted from the drafters' dissatisfaction with the phrase "intentional illicit act," which had been included in an earlier draft of Article 25. *See* Warsaw Minutes at 265.[12] Initially, the delegates could not agree on proposed substitutions to replace "intentional illicit act." The German delegation suggested the term "faute lorde," which the delegates equated with a common-law gross negligence standard, *see id.* 58-59, 61, 278, 290, while the British delegation proposed to limit the exemption to acts committed deliberately for the purpose of injury. *See id.* at 298. The Brazilian delegate, Alcibiades Pecanha, presciently observed that the competing proposals raised the question whether the air carrier's conduct was to be measured by an objective or subjective standard, and consequently endorsed a compromise approach. *See id.* at 61.

Ultimately, the delegates rejected the inclusion of "faute lorde" and retained the French word "dol," adding that a court may apply the legal equivalent of "dol" as defined by the law of the forum jurisdiction. Warsaw Convention art. 25(1). As noted by British delegate Sir Alfred Dennis, the adopted language reflects the delegates' agreement that "dol" was to be translated into English as willful misconduct, *see* Warsaw Minutes at 213, which Sir Dennis defined as "cover[ing] not only deliberate acts but also careless acts done without regard for the consequences." *Id.* at 59-60.

The drafting history thus reveals that conferees rejected an effort to define willful misconduct to encompass gross negligence. Although Sir Dennis' characterization of willful misconduct suggests that the standard may be satisfied without establishing that the carrier knew its actions placed its passengers at risk, the language adopted by the conference does not expressly embody this characterization. We therefore find the 1929 drafting history to be ambiguous in this respect.

---

[12]In the draft considered at the Warsaw conference, the provisions contained in Article 25(1) of the Convention initially were found in Article 24. *See* Warsaw Minutes at 214. A subsequent amendment placed the provisions in Article 25(1).

In sum, the recent legislative history surrounding Montreal Protocol No. 4 is consistent with a reasonable interpretation of the original text, and the drafting history for the original Convention does not suggest otherwise. Given the uniform and clear statements of those who enacted and adopted the amended language contained in Montreal Protocol No. 4, we find these statements to be persuasive indicators that the Protocol clarifies, rather than effects a substantive change to, existing law.

*C. Summary of Law*

For the reasons that we have explained, we conclude that Montreal Protocol No. 4 clarifies the definition of willful misconduct under Article 25, rather than effecting a substantive change in the law. The amended language provides a more precise articulation of the standard, requiring a passenger to prove that the carrier, or its servants or agents, acted: (1) "with intent to cause damage," or (2) "recklessly and with knowledge that damage would probably result." Montreal Protocol No. 4, art. IX, *reprinted in* Goldhirsch at 358. This definition of the standard replaces the less precise articulation set forth in *Butler,* including the reckless disregard standard employed by the district court. Under the clarified standard, we no longer inquire as to reckless disregard, but rather examine whether the pilots of Flight 965, at a minimum, acted recklessly and with knowledge that their conduct likely would result in damage.

Before applying the Protocol's clarified definition of the standard to this case, we believe it is necessary to comment upon the type of evidence that may be used to satisfy the standard. For this task, we refer to *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), where the Court announced its standard for "deliberate indifference" in Eighth Amendment cases. 511 U.S. at 837, 114 S.Ct. at 1979. The *Farmer* Court's discussion is helpful here because the Court explained in great detail how a plaintiff may prove that a defendant subjectively knew that his or her actions would likely result in harm to the plaintiff. *See id.* at 836-44, 114 S.Ct. at 1978-82; *see also Saba,* 78 F.3d at 669 (analogizing the *Farmer* Court's discussion to a plaintiff's claim that air carrier engaged in willful misconduct under Article 25).

*Farmer* begins its analysis by dividing the legal definition of recklessness into two distinct standards, one measured objectively and the other subjectively. 511 U.S. at 836-37, 114 S.Ct. at 1978-79. An objective

test, according to *Farmer,* examines whether an actor acts or fails to discharge a duty to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 836, 114 S.Ct. at 1978.  A subjective test, on the other hand, asks whether an actor has disregarded a risk of harm of which he is aware.  *Id.* at 836-38, 114 S.Ct. at 1978-79.  Stated differently, to satisfy the subjective test the actor "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837, 114 S.Ct. at 1979.  Because the language set forth in Montreal Protocol No. 4 also requires a plaintiff to establish that the carrier knows that its conduct likely will result in damage—in other words, that the carrier has drawn an inference that a risk of harm exists—Article 25 creates what *Farmer* defines as a subjective test.

Under *Farmer,* establishing knowledge on the part of the actor need not be accomplished solely by direct evidence;  a factfinder is permitted to infer from circumstantial evidence that the actor actually drew the inference that the circumstances posed a substantial risk of harm.  *Id.* at 842, 114 S.Ct. at 1981.  Indeed, it is possible to premise this inference on "the very fact that the risk was obvious."  *Id.* Obviousness of the risk thus plays a role in both the subjective and the objective tests.  The difference, when the tests are put into practice, is a fine one.  The objective test is satisfied if a grave risk is sufficiently obvious, because the person "should have" been aware of the risk regardless of whether he actually recognized it.  *See Saba,* 78 F.3d at 669.  The subjective test, on the other hand, precludes a finding of liability if the factfinder concludes that, even though a grave risk is obvious, no inference can be made that the actor actually became aware of the risk.  *See Farmer,* 511 U.S. at 844, 114 S.Ct. at 1982 ("That a trier of fact may infer knowledge from the obvious ... does not mean that it must do so.").  In this way, a plaintiff may rely solely upon circumstantial evidence related to the obviousness of a grave risk to satisfy both tests, but the subjective test is satisfied only if the circumstances also permit an inference that the actor "must have known" about the risk.  *Id.* at 842-43, 114 S.Ct. at 1981-82.  "It is not enough merely to find that a reasonable person would have known, or that the defendant should have known," of the risk.  *Id.* at 843 n. 8, 114 S.Ct. at 1982 n. 8. Thus, while an objective test asks whether an actor "should have known" of an obvious risk, the subjective test requires, at

a minimum, a showing that the actor "must have known" of the risk. *Cf. Spruce v. Sargent,* 149 F.3d 783, 786 (8th Cir.1998).[13]

### D. Entry of Summary Judgment Against American

Having determined the proper test to be applied, we now turn to American's argument that the district court improperly entered summary judgment in favor of the passengers on the issue of willful misconduct. Without having the benefit of Montreal Protocol No. 4's more precise language, the district court applied a test for willful misconduct that is at odds with the conclusions contained in our opinion. Acting perhaps out of an abundance of caution, however, the district court held in the alternative that, because the pilots of Flight 965 decided to continue descending even though they knew they were off course in a dangerously mountainous region, Piamba Cortes was entitled to summary judgment on the issue of willful misconduct even under a subjective test. If correct, the district court's decision may be affirmed on this ground without requiring a remand.

We review a district court's entry of summary judgment *de novo. See City of Tuscaloosa v. Harcros Chems, Inc.,* 158 F.3d 548, 556 (11th Cir.1998). Summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). In assessing whether the movant has met its burden of demonstrating the absence of a genuine issue of fact, the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). An issue of fact

---

[13]Courts have spoken of a "liability continuum" that runs from simple negligence to intentional conduct undertaken with the purpose of harming others. *See Saba,* 78 F.3d at 668. The subjective test described in this opinion lies closer on this continuum to intentional misconduct than does the objective test. While we take great care to specify that the two standards are distinct, we acknowledge that the differences are indeed subtle, especially when a plaintiff relies solely on circumstantial evidence. *Cf. West v. Waymire,* 114 F.3d 646, 651 (7th Cir.) ("Granted, there may be less here than meets the eye. The difference between a 'plainly obvious' and an actually known danger—the critical difference between the [subjective] and [objective] standards of recklessness—may have little significance in practice, given the difficulty of peering into minds ...."), *cert. denied,* --- U.S. ----, 118 S.Ct. 337, 139 L.Ed.2d 261 (1997); Goldhirsch at 122 ("Despite the difference in approach [in a subjective and objective test], the results are more or less the same. In cases where the courts have applied the subjective test, the wrongdoer's knowledge of harm was often implied. Therefore, a case that purports to use the subjective standard but which accepts circumstantial evidence to prove the state of mind of the wrongdoer is so closely akin to an objective test that there is no longer any necessity to distinguish between the two.").

is genuine, thus barring the entry of summary judgment, unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).[14]

Piamba Cortes argues that the pilots of Flight 965 knew that, by continuing their descent even though they knew the plane was off course in a mountainous region, their conduct likely would result in harm to the passengers. To justify entering summary judgment in her favor on this claim, Piamba Cortes must show that no genuine dispute exists with respect to three distinct factual issues: (1) the pilots of Flight 965 knew that the plane was significantly off course in a mountainous region; (2) the pilots knowingly elected to continue descending the plane; and (3) the pilots knew that descending the plane under such circumstances would likely result in harm to the passengers.

The second and third issues are easily resolved in Piamba Cortes' favor. The record is replete with convincing circumstantial evidence that both Tafuri and Williams knew that continuing a descent in a mountainous region when the aircraft was significantly off course would create a risk of danger to the passengers. Most compelling, however, is the fact that American did not argue to the contrary in the district court and does not argue to the contrary on appeal. Tafuri and Williams' awareness that such conduct would create a risk of injury to passengers therefore is not at issue here.

The same is true with respect to the pilots' knowledge that the plane was descending. Statements by the pilots recorded by the cockpit voice recorder reveal that the pilots were actively monitoring the plane's altitude during the descent. Furthermore, American once again poses no argument to the contrary on appeal.

---

[14]Like the district court, we reject American's broad assertion that, because Article 25 requires a factual finding regarding an actor's state of mind, the issue defies determination as a matter of law on summary judgment. *See In re Air Crash Near Cali,* 985 F.Supp. at 1123, 1124 ("[T]he principles of Rule 56 apply to all lawsuits.... [E]ven assuming that the term willful misconduct requires a subjective inquiry ..., there are many instances in the law where the evidence of state of mind is so unequivocal that summary judgment is proper and, indeed, expressly mandated by Rule 56."). Our holding that Piamba Cortes' evidence fails to meet this standard does not imply that, given a different set of facts, a passenger cannot be awarded summary judgment with respect to the application of the Convention's liability cap under Article 25.

The final, and most difficult, question is whether the pilots in fact knew that the aircraft was off course while it was descending. We narrow this inquiry to reflect the fact that, in order to enter summary judgment in favor of the passengers, the pilots must have known that the aircraft was "significantly" off course[15]—in other words, at risk of leaving the valley while the pilots continued their descent. If the pilots believed that the plane was *slightly* off course, yet well within the safety of the valley, a factfinder reasonably might infer that the pilots were not actually aware that their actions probably would result in injury to the passengers.[16] On the other hand, the pilots need not have realized that the aircraft had flown all the way out of the valley to realize that their conduct placed the passengers at risk of harm. As American concedes, if the pilots knew the plane was significantly off course, the only reasonable inference a factfinder could make is that the pilots knew the plane was at risk of crashing into the mountains. Consequently, entry of summary judgment in favor of Piamba Cortes hinges upon a narrow finding that a reasonable juror could only infer that Tafuri and Williams realized the aircraft was significantly off course during the time they continued their descent.

The district court concluded that the only plausible inference to be taken from the evidence was that the pilots knew that they had strayed significantly away from the published arrival path. We agree with the district court that a reasonable factfinder must conclude that the pilots knew they were off course. We disagree, however, that the *only* reasonable inference was that the pilots knew they were *significantly* off course; to the contrary, even though more plausible interpretations suggest otherwise, a factfinder reasonably might conclude that the pilots believed they were near enough to the published arrival path that they did not realize they had placed the passengers at risk of harm.

The district court set forth a detailed and thorough account of the circumstantial evidence supporting a finding that the pilots realized they were not on the published flight arrival path to Cali. *See generally In*

---

[15]The district court also used the words "profoundly" and "radically" off course.

[16]The converse, of course, also is true, that even if the pilots believed they were close to the published flight path, it is possible to infer that the pilots nonetheless recognized that their conduct placed the passengers at risk of injury, thus creating a question to be resolved by the factfinder. As we explain, however, this inference is not mandatory under the facts of this case.

*re Crash Near Cali,* 985 F.Supp. at 1138-43. This occurred after the pilots mistakenly entered "Romeo" instead of "Rozo" into the FMC and the plane turned east toward the mountains. According to the district court, the pilots likely would have realized that, in light of the amount of time they had been flying east, the aircraft in fact was significantly off the published course to the Tulua waypoint. Nonetheless, the evidence did not show conclusively that the pilots perceived the amount of time that they had been flying east toward the mountains, thus allowing a reasonable inference that the pilots believed the aircraft to be near the published arrival path even after the turn. *Id.* at 1140. The circumstances changed, however, at the moment marked 21:38:54 on the cockpit voice recorder, when the pilots realized that the aircraft was headed in the wrong direction and must turn to the right to intercept the proper course. As summarized by the district court, the pilots' statements—such as "[w]here're we going" and "we got fucked up here didn't we?"—added with expert testimony describing this portion of the flight—allow only one reasonable inference: that the pilots realized that the plane was not on the published arrival path.

The evidence is not equally compelling, however, with respect to the pilots' knowledge of the *extent* that they had traveled off course. We agree with the district court that, given the pilots' statements on the cockpit voice recorder, a highly plausible inference to be taken from the evidence is that "the pilots did not even know precisely where they were in the sky." *Id.* at 1142. Nonetheless, at one point during the pilots' discussion of the aircraft's location Tafuri says, "You're okay, you're in good shape now," which the district court concedes "can be read as an indication that Tafuri, at least, believed the plane was on or very near the published route." *Id.* at 1143.

The district court considered this statement by Tafuri in the context of other circumstantial evidence. We do the same, and conclude that evidence relating to the plane's instrument readings permit a reasonable inference that Tafuri's statement actually reflects a belief that the plane was not at risk of leaving the valley. At the moment marked 21:39:24 on the cockpit voice recorder, Tafuri dialed the correct frequency for the Tulua waypoint into his EHSI, which prompted the plane's D-bar indicator to shift on the computer screen. Up until that moment, the EHSI had been programmed using the frequency for an incorrect waypoint located

well to the east of the valley, thus causing the D-bar indicator to indicate that the Tulua waypoint was located to the left of the plane. American argues that the shift of the D-bar indicator allowed Tafuri to believe that they had passed the Tulua waypoint or a vector leading to the published arrival path, and thus supports a conclusion that Tafuri believed that he was close to the published arrival path and needed only to continue a right-hand turn in order to intersect the arrival path.

Piamba Cortes and the district court offer several reasons why this inference should be rejected as unreasonable.[17] First, the compass heading during this portion of the flight was approximately 120 degrees compared to the proper compass heading (a radial heading south and slightly west at approximately 202 degrees) used in the published arrival path. The district court found that even a brief glance at the compass heading would have informed the pilots that they had veered dramatically off course. Second, once Tafuri dialed the proper frequency for the Tulua waypoint, the pilots necessarily realized that the Tulua waypoint was located to the left and behind the plane; thus, the district court found that the right-hand turn executed by the pilots was inconsistent with an attempt to fly over the Tulua waypoint or to intercept the flight path. Third, the pilots noted at one point that their distance to the airport was thirty-eight miles, but recognized that this distance remained thirty-eight miles even after the passage of one minute and fourteen seconds, which the district court found would have communicated to the pilots not only that they were not heading towards the airport, but that they had traveled a significant distance off course.

Considered together, this circumstantial evidence certainly permits a factfinder to infer that the pilots realized that the aircraft had veered significantly off course. This interpretation, however, is not the *only* reasonable inference that can be taken from this evidence, as the entry of summary judgment requires. No evidence conclusively demonstrates that the pilots actually monitored their compass heading, or that the pilots in fact recognized that, because they failed to reduce the distance between the aircraft and the airport, they

---

[17]The district court's discussion of the permissible inferences to be taken from the plane's instruments is contained in the portion of the order addressing whether the pilots engaged in willful misconduct as measured under an objective test, and thus the district court's analysis is framed in the context of whether the pilots "should have recognized" how far they veered off course based on this evidence. The reasoning underlying the district court's discussion nonetheless is useful to our discussion of whether the pilots "must have known" how far they veered off course.

had traveled a significant distance from the published flight path. If the pilots failed to put these connections together, a factfinder reasonably may infer that the shift in the D-bar indicator led the pilots to believe that they had just intersected the vector leading to the published flight path and thus were close to the flight path and within the valley. Combined with the plausible inference taken from Tafuri's comment that "[y]ou're okay, you're in good shape now," it is not unreasonable to infer that the pilots believed they were close to the published flight path and thus did not recognize that their actions placed their passengers at risk of injury.

Piamba Cortes also places great reliance upon the fact that Tafuri and Williams' actions violate FAA regulations and the principles of flying in Latin America that American teaches its pilots. We agree with Piamba Cortes that the pilots' failure to comply with their training and with FAA regulations certainly constitute circumstantial evidence that supports a finding that Tafuri and Williams knew their conduct placed the passengers at risk. Under the totality of the evidence in this case, however, a factfinder may reasonably infer that, despite the pilots' training and compliance with FAA regulations, they were not subjectively aware at the time they executed their descent into Cali that the descent probably would result in damage.[18]

The District of Columbia Circuit observed that when "no one knows exactly what happened" to cause a pilot to commit errors and crash and the plaintiff has no unequivocal direct evidence, "questions [of willful misconduct] depend upon inferences to be drawn from essentially circumstantial evidence ... [and][o]ne can hardly imagine a clearer case in which such questions should have been left to the jury." *In re Korean Air Lines Disaster of September 1, 1983,* 932 F.2d 1475, 1481 (D.C.Cir.1991) (first and third alterations in original). Of course, *Korean Air* did not include a recording of the pilots' conversations in which they stated that they were off the published arrival path. Nonetheless, under the circumstances of this case, other statements in the pilots' conversation and circumstantial evidence permit a reasonable inference that the pilots believed they were close to the flight path, creating a question of fact whether the pilots recognized that their conduct probably would result in damage.

---

[18]Piamba Cortes also places great reliance upon "admissions" that American has made during the course of the proceedings. In our view, none of the admissions, when viewed in a light most favorable to American, compel a finding that Tafuri and Williams knew that Flight 965 was significantly off course or that Tafuri and Williams knew that their conduct likely would result in damage.

For these reasons, we conclude that the district court erred in entering summary judgment against American with respect to unlimited liability under the Warsaw Convention. We therefore vacate the district court's entry of summary judgment on the issue of American's liability in excess of the Convention's liability cap, and remand for a determination by the trier of fact whether Piamba Cortes may seek compensatory damages in excess of the limit created by the Convention.

## III. CONFLICT OF LAWS CONCERNING COMPENSATORY DAMAGES

The district court concluded that, under the relevant conflict-of-laws rules,[19] Florida's compensatory damages scheme governed all claims arising from the crash of Flight 965 that were filed in the Southern District of Florida, regardless of whether the claims were filed on behalf of domiciliaries of Florida or Colombia. The district court therefore applied Florida law to determine the compensatory damages to which Piamba Cortes was entitled for the death of her sister, who was a domiciliary of Colombia at the time of the crash. American argues that the proper conflict-of-laws analysis must focus upon the decedent's domicile, and thus the district court should have applied Colombia's compensatory damages scheme to Piamba Cortes' claims.

A district court's resolution of a conflict-of-laws issue is a legal question that we review *de novo*. *See LaFarge Corp. v. Travelers Indem. Co.,* 118 F.3d 1511, 1514-15 (11th Cir.1997).

Before turning to the merits of this issue, it is necessary to clarify the scope of this opinion as it relates to the many cases arising out of the crash of Flight 965. In its order on conflict-of-laws issues, the district court determined that, with certain limited exceptions, Florida compensatory damages law applies across the board to all cases filed in the Southern District of Florida. Here, we are presented with a much narrower inquiry, that is, determining which compensatory damages law must be applied to Piamba Cortes' claims. Although the district court at times considered the conflict-of-laws problem in the context of all the

---

[19]American removed this case to federal court under both diversity and federal question jurisdiction. The district court observed that Florida's conflict-of-laws rules are the same as federal common-law conflict-of-laws rules, because both have adopted the Restatement (Second) of Conflict of Laws. *See* SR-365-5-6 n. 3. Therefore, the same rules would be applied under either diversity jurisdiction or federal question jurisdiction. *See id.*

passenger lawsuits aggregated together—in other words, regardless of the domiciles of the individual decedents—the district court tailored its final resolution of the conflict-of-laws problem by separating the decedents by domicile. *See, e.g.,* SR-365-30 n. 10. The district court thus relied upon independent reasons for applying Florida compensatory damages law to claims involving decedents who, like Piamba Cortes' sister, were domiciliaries of Colombia. Consequently, we are able to review the district court's ruling as it pertains specifically to Piamba Cortes' claims. Our analysis focuses upon this narrow issue, however, and we do not purport to review the conflict-of-laws issues raised by any other cases related to the crash of Flight 965.

*A. Applicable Law*

Piamba Cortes' claims arise under the Warsaw Convention, which provides that air carriers shall be liable "for damage sustained" in the event of the death or wounding of a passenger on a flight that falls under the scope of the Convention. Warsaw Convention art. 17. In *Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996), the Supreme Court held that, with respect to the types of compensatory damages awarded to passengers, the Convention "provide[s] nothing more than a pass-through, authorizing [courts] to apply the law that would govern in absence of the Warsaw Convention." 516 U.S. at 229, 116 S.Ct. at 636. Here, the district court concluded that the question of compensatory damages created a conflict-of-laws problem and thus applied the "most significant relationship" test articulated in the Restatement (Second) of Conflict of Laws (1971) (hereinafter "Restatement"). The parties do not challenge this decision.

The Restatement provides that, in a wrongful death action, "the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship ... to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement § 175 (general rule); *see also id.* § 178 (specific rule for wrongful death actions). This preference for the state in which the injury occurred all but disappears, however, when the conflict of laws involves the issue of damages in wrongful death actions. As the

commentary observes, the fact that conduct leading to a wrongful death—as well as the death itself—occurred in a certain jurisdiction does not, by virtue of these contacts alone, create a significant interest for that jurisdiction to apply its damages law to a subsequent lawsuit. *See id.* § 178 cmt. b. Courts instead are instructed to refer to the general conflict-of-laws principles set forth in section 6, as well as principles specific to tort claims set forth in section 145, to identify jurisdictions that possess the greatest interest in applying their compensatory damages schemes. *See id.* §§ 175 & 178. For these reasons, no rigid rules exist for resolving conflict-of-laws problems in wrongful death actions governed by the Restatement, requiring instead an examination of the interests created by the facts and circumstances presented in each case. *See Judge v. American Motors Corp.,* 908 F.2d 1565, 1568 (11th Cir.1990).

*B. Interested Jurisdictions Under Section 145*

Section 145 lists four types of contacts to be taken into account when identifying jurisdictions that possess an interest in applying their compensatory damages schemes:

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.

Restatement § 145(2). Under the facts and circumstances of this case, we identify four jurisdictions that possess interests in applying their compensatory damages schemes to this case: Colombia, the place of the crash and the domicile of both the plaintiff and the decedent; Florida, the domicile of the two deceased pilots and the state in which their estates were probated,[20] as well as a place where American transacts significant business; Texas, the principal place of American's business; and Delaware, the state of American's incorporation. The parties argue in favor of only two jurisdictions, Colombia and Florida, so we need not consider further the interests of Texas and Delaware.

---

[20]In her Complaint, Piamba Cortes named the estates of the two pilots as defendants.

American argues that Florida's interests in this case are illusory for two reasons.  First, American observes that it agreed to satisfy any judgment against the estates of the pilots, thus eliminating the contacts created by these defendants.  American further points out that Piamba Cortes dismissed her claims against the pilots' estates several months after the district court resolved the conflict-of-laws issue.  Second, American argues that its business activities in Florida are not sufficient to create a relationship with Florida under section 145(2)(c).  We consider each argument in turn.

American's agreement to satisfy a judgment against the estates of the two pilots does not, under the circumstances of this case, extinguish the relationship with Florida under section 145(2).  We first observe that American has not pointed to any evidence in the record to support its assertion that such an agreement exists.  Even if such evidence existed, satisfaction agreements may be disputed in later stages of litigation and do not always remove the defendant entirely from the scope of the case.  Of equal concern is the possibility that a defendant, seeking to avoid the application of a jurisdiction's generous damages scheme, could agree to satisfy judgments against any co-defendants who are domiciliaries of that jurisdiction.  We do not imply, of course, that American's agreement with the estates of the two pilot defendants reflected this type of strategic behavior;  we make the observation solely to demonstrate the possibilities for opportunistic conduct that might arise if such agreements could dictate the results of conflict-of-laws problems.

Piamba Cortes' decision to dismiss her claims against the estates of the pilots several months after the district court resolved the conflict-of-laws issue does not alter our conclusion.  American has not shown, and does not argue, that at the time of the district court's decision the estates were improperly named parties to the lawsuit.  Consequently, at the time the district court resolved the conflict-of-laws issue, the inclusion of the pilots' estates as defendants created a viable relationship with Florida.[21]

Second, American's argument concerning the insufficiency of its business contacts with the state of Florida misconstrues the language used in section 145.  According to American, a state has a relationship

---

[21]Because the record contains no indication that the estates of the two pilots were improperly named defendants in this case, we need not concern ourselves with the possibility that Piamba Cortes included these defendants solely for forum-shopping purposes.

under section 145(2)(c) only if the state is a party's "principal place of business." The text of the Restatement, however, directs courts to consider the "place of business of the parties." Restatement § 145(2)(c). The authors of the Restatement were familiar with the term of art "principal place of business" and used it several times in the commentary to section 145, *see* § 145 cmt. e, at 421. Given the authors' use of the less specific phrase "place of business" in the text of the section, as well as in other portions of the commentary, *see id,* we conclude that, had the authors intended to limit § 145(2)(c) to a corporation's "principal place of business," they would have done so expressly.

We agree that a party's principal place of business ordinarily should be afforded more weight than a jurisdiction in which the party has only business interests, but we cannot agree that a jurisdiction in which the party has sizeable business activities—especially when the activities are directly related to the relevant litigation—has no relationship with the litigation for purposes of section 145(2). This case exemplifies this principle, as the district court found not only that Miami serves as one of American's primary transportation hubs, but also that Miami is the site from which American orchestrates its Latin American operations. Consequently, while we do not overstate the relationship created by these circumstances, *see id.* ("[t]he fact ... that one of the parties ... does business in a given state will usually carry little weight of itself"), we conclude that American's substantial business activities in Florida in this case justify the district court's finding that Florida has an interest in this litigation under section 145(2).

*C. Most Significant Interests Under Section 6(2)*

Having identified both Florida and Colombia as interested sovereigns, we now must specify which sovereign's interests are more "significant." *Judge,* 908 F.2d at 1569.

> To discharge this task, we cannot simply add up the factors delineated in section 145(2) and then apply the law of the sovereign with the greatest numerical total.... Rather, we must, as mandated by section 145(1), turn to the factors delineated in section 6 to determine which sovereign has the most significant contact.

*Id.* Section 6(2) lists seven factors to consider when weighing the interests of a sovereign in a particular case:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result; and

(g) ease in the determination and application of the law to be applied.

Restatement § 6(2)(a)-(g). As we explain, the importance of these factors varies depending on the nature of the issue that underlies the conflict of laws. *Id.* § 145 cmt. b.

*1. Balancing of Interests Under Sections 6(2)(b) and (c)*

We observed in *Judge* that the section 6(2) analysis for wrongful death claims "turns in large part on the balance of competing interests contemplated by sections 6(2)(b) and 6(2)(c)." 908 F.2d at 1569. This balancing occurs in three steps. First, we identify the particular rule of law to be applied by each interested state. *Id.* Second, we identify the purposes or policies underlying each state's rule. *Id.* Third, we "assess the degree to which the purposes underlying each rule would be furthered by the rule's application." *Id.* at 1569-70. "As a general proposition, 'it is fitting that the state whose [policy] interests are most deeply affected should have its local law applied.' " *Id.* at 1570 (citation omitted).

Identifying the particular rule of law to be applied by each interested state has proven to be a difficult enterprise. Florida law is rather straightforward, permitting "survivors," meaning one's spouse, children, parents, dependent blood relatives, and adoptive siblings, to collect the value of lost support and services, future loss of support and services, loss of companionship or parental companionship, mental pain and suffering, medical or funeral expenses, loss of earnings, and net accumulations. Fla. Stat. Ann. §§ 768.18 & 768.21 (West 1997). Identification of the proper Colombian law that would apply in this case, on the other hand, raised "pervasive and profound" differences of opinion among the parties not only on the subject of the proper elements of compensatory damages, *see* SR-365-19-26, but also on the role of judicial authority under Colombia's civil law system to resolve this question. *See id.* at 27-29. After an exhaustive examination of Colombia's law on compensatory damages, the district court found itself unable to reach any final conclusions

with respect to whether limitations exist in the types of compensatory damages recoverable under Colombian law. *See id.* at 19.

American nonetheless assumes on appeal that Colombian law imposes a cap on the recovery of non-pecuniary damages (approximately $8,000) and disallows recovery of net accumulations. American does not challenge directly the conclusions of the district court with respect to the lack of clarity in Colombian law; if American intended to do so implicitly, it points to no evidence that calls into question the district court's ruling.[22] Even so, because we conclude that the district court correctly applied Florida's compensatory damages scheme regardless of whether Colombian law restricts recovery, we will follow American's assumption for purposes of our analysis in this opinion. We nonetheless observe that, under the present state of the record, it is equally likely that Colombian law imposes none of the limitations alleged by American; under such circumstances, the conflict of laws at issue in this appeal essentially vanishes, providing a separate ground for affirming the decision of the district court.

We are able to identify several policies that underlie Colombia's compensatory damages scheme as described by American. First, the law seeks to compensate Colombian domiciliaries for the wrongful death of a relative caused by a third party. Second, the restrictions on recovery serve to protect domiciliary defendants from what Colombia has deemed to be excessive damages awards. American extends this goal to non-domiciliary defendants as well, arguing that the restrictions on damages encourage foreign corporations to transact business in Colombia without fear of oppressive damages awards.

Similarly, the primary purpose underlying Florida's compensatory damages scheme is "to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer." Fla. Stat. Ann. § 768.17. Although Florida has not enacted restrictions on recovery similar to those adopted by

---

[22]American cites only an affidavit prepared by its expert, a Colombian law professor and former judge, that suggests that Colombian law caps non-pecuniary damages and restricts recovery of net accumulations. American, however, overlooks a contrary affidavit prepared by a former judge of Colombia's Supreme Court of Justice that states that no such limitations exist. *See* SR-365-20-22. The district court considered both affidavits, performed its own review of the relevant Colombian legal authority, and found that the record did not conclusively establish the validity of either position. *Id.* at 22-29. American's citation to the affidavit filed by its expert, by itself, fails to persuade us that the district court's analysis is erroneous.

Colombia, we agree with the district court that a secondary purpose underlying Florida's compensation scheme is that damages awards are sufficient to compensate survivors of a decedent while not posing an excessive and unfair burden upon domiciliary defendants. *Cf.* Fla. Stat. Ann. § 768.74(1) (conferring discretion to courts to review damages awards to ensure that they are neither excessive nor inadequate).

We first examine whether Colombia's policy of compensating its domiciliaries would be served in this case. Piamba Cortes argues that, if another available jurisdiction's compensatory damages scheme is more generous than Columbia's scheme, Colombia's policy of compensating survivors of the decedent would be frustrated by applying its less generous compensatory damages scheme. The district court concluded that, although Colombia's interest in applying its less generous compensatory damages scheme "might diminish" under these circumstances, Colombia nonetheless possesses a "compelling" interest in applying its damages scheme in cases involving Colombian decedents injured on Colombian soil. SR-365-38. We agree with the district court. The fact that the decedent was a domiciliary of Colombia, combined with the fact that the primary claimants—including Piamba Cortes—also are Colombian domiciliaries, creates an interest on Colombia's behalf to ensure proper compensation for these claimants.

The same cannot be said with respect to the policies underlying Colombia's restrictions on compensatory damages. No Colombian domiciliaries are named as defendants, and the general rule in this circuit is that "a limit on recovery should not be applied when there is no domiciliary defendant because it advances no policy behind the limitation." *Foster v. United States,* 768 F.2d 1278, 1283 (11th Cir.1985). Notwithstanding this general rule, we have recognized in *dicta* that a restrictive damages scheme may be designed to encourage non-domiciliary corporations to transact business within a jurisdiction and that this policy may be furthered by applying the scheme to a non-domiciliary defendant. *See Judge,* 908 F.2d at 1572-73. We also observed that, although the "foreign investment interest" theory is plausible, a party invoking the theory must adduce evidence to support the assumptions underlying the theory. *Judge,* 908 F.2d at 1572-73. In this case, the district court found that American had adduced no evidentiary support for this theory, *see* SR-365-35, and American points to no evidence on appeal to discredit this finding. In the absence

of such evidence, the assumptions underlying this theory are "too strained to merit serious weight under section 6(2)(c)," *Judge,* 908 F.2d at 1573, and the district court correctly rejected American's argument.

We next examine whether the policies underlying Florida's compensatory damages scheme would be furthered by applying Florida law to this case. As the district court noted, the policies underlying Florida's compensatory damages scheme for wrongful death claims would indeed be served if claimants filing on behalf of the decedent included Florida domiciliaries. Piamba Cortes, however, identifies no Florida domiciliaries among the possible survivors who possess a claim under Florida law in this case. In fact, our review of the record reveals that the decedent was, and the primary claimants are, domiciliaries of Colombia. Although Florida's compensatory damages scheme is apparently more generous than Colombia's, the purpose underlying Florida law is to provide an adequate remedy for its *own* domiciliaries. Fla. Stat. Ann. § 768.17. Florida thus possesses no interest in compensating domiciliaries of other jurisdictions more richly than they would receive in their own courts. *See In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982,* 821 F.2d 1147, 1175 (5th Cir.1987) (Gee, J., concurring in part and dissenting in part), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989).

Florida nonetheless retains an interest in ensuring that a compensatory damages award against its own domiciliary defendants is not excessive. In this case, Piamba Cortes named as defendants the estates of the pilots, who were domiciliaries of Florida and whose estates were probated in Florida. Consequently, although Florida's interest in this case is not as compelling as Colombia's interest in applying its compensatory damages scheme to the claims of its own domiciliaries, the fact remains that this interest would be furthered by applying Florida's compensatory damages scheme to this case.

In sum, the policies of both Colombia and Florida would be furthered by applying their compensatory damages schemes to this case. Balanced together, this analysis weighs slightly in favor of applying Colombian law because, as noted above, the policy to be served under Colombian law is more compelling

than the policies served by applying Florida law. This conclusion, however, does not end our analysis under section 6(2), and we must proceed to examine the remaining factors.

## 2. Remaining Factors Under Section 6(2)

Section 6(2)(a) reminds courts that the resolution of a conflict-of-laws problem should "further harmonious relations between states and ... facilitate commercial intercourse between them." Restatement § 6 cmt. d. Noting that the choice of the damages law to be applied to this case must accommodate existing political and commercial relationships, the district court concluded that both Florida and Colombia law "could be applied across the board without significantly disturbing interstate comity." SR-365-45. We agree. If we continue to accept, for the sake of argument, American's contention that Colombia has adopted a more restrictive compensatory damages scheme,[23] the absence of a defendant who is a Colombian domiciliary and who would benefit from Colombia's damages scheme allows Florida's more generous law to be applied without threatening international comity. Likewise, because no claimant is a domiciliary of Florida, the application of Colombia's more restrictive damages scheme would pose no threat to international comity as well. This factor therefore favors neither Florida nor Colombia.

The commentary to the Restatement advises that the factors listed in sections 6(2)(d) and (f) typically have little significance in tort cases. *See* Restatement § 145 cmt. b, at 415-16. It is rarely the case that parties in a tort suit—especially when the injury is unintended—plausibly can argue that they possessed justified expectations concerning the law to be applied to the suit or planned their conduct according to a jurisdiction's damages law. *See id.; see also id.* § 6 cmt. g (in unintentional harm suits, "the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question"); *id.* § 6 cmt. I ("Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions."). This commentary accurately describes this case, where no evidence suggests that the decedent's travel plans, or the plans of any claimants,

---

[23] As discussed earlier, if Columbian law does not contain the restrictions on damages as described by American, the conflict of laws presented in this appeal essentially vanishes, providing a separate ground for affirming the district court.

hinged upon the advance recognition of, or reliance on, either jurisdiction's law governing compensatory damages. As a result, we heed the Restatement's advisory that, "[b]ecause of the relative insignificance of [factors (d) and (f) ] ... in the tort area of choice of law, the remaining factors listed in § 6 assume greater importance." *Id.* § 145 cmt. b at 416.

We next consider the policies underlying the field of law involved in the lawsuit pursuant to section 6(2)(e). The commentary to the Restatement instructs that, where the policies of the interested states are largely the same but the rules contain minor differences, "there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved."[24] Restatement § 6 cmt. h. Although a number of important policies underlie the field of tort law, the Restatement identifies two in particular: the provision of compensation for injured victims and the deterrence of tortious conduct. *Id.* § 145 cmt. b, at 416. If we continue to accept, for the sake of argument, American's contention that Colombia's compensatory damages scheme is more restrictive than Florida's,[25] application of Colombian law arguably would frustrate these goals by limiting the amount the tortfeasor must pay to compensate the victim and her survivors. Consequently, this factor weighs slightly in favor of applying Florida law.

Finally, we consider the ease in determination and application of the law to be applied under § 6(2)(g). Here, two eminent Colombian jurists and scholars expressed profound disagreement whether Colombian law caps non-pecuniary damages and restricts the recovery of net accumulations, and the district court's review of the available legal authorities failed to reconcile this debate. The district court therefore concluded that the process of determining and applying Colombian law would be extremely complicated, expensive, and time consuming. As recognized earlier, American assumes on appeal that Colombian law unequivocally contains these restrictions but relies only upon the same evidence presented to the district court

---

[24]The field of law involved in this lawsuit is the law of torts. The policies underlying tort law are not necessarily the same as the policies underlying a particular rule or statute adopted by an interested jurisdiction. The latter are considered under § 6(2)(b) and (c). Here, we consider only the policies underlying the law of torts.

[25]The observation expressed in footnote 24 applies with equal force to our discussion here.

to support this assumption. This showing fails to persuade us that the district court's interpretation of Colombian law was erroneous. Because the measure of compensatory damages available under Florida law is straightforward and easy to apply, we conclude that this factor weighs heavily in favor of applying Florida law.

### D. Summary

The resolution of a conflict-of-laws problem "represents an accommodation of conflicting values." Restatement § 6 cmt. c. This case is no exception. On the one hand, the policies underlying each jurisdiction's compensatory damages scheme weigh slightly in favor of applying Colombian law. On the other hand, the policies underlying tort law, as well as the severe difficulties in determining and applying Colombian law, weigh in favor of applying Florida law.

Given the circumstances of this case, an overall balancing of these factors tips in favor of applying Florida law. Although Colombia possesses an interest in applying its compensatory damages scheme to the claims of Colombian domiciliaries on behalf of a Colombian decedent, the absence of a Colombian defendant who would benefit from Colombia's more restrictive damages scheme renders these interests less compelling. In contrast, the application of Florida law furthers the policies underlying Florida's compensatory damages scheme as well as the field of tort law in general, and—importantly—would not frustrate the policies underlying Colombia's damages scheme.

Consequently, the scales are approximately even when we come to the problem of ascertaining Colombia's law on compensatory damages in wrongful death cases. In light of the severe difficulties presented by such an exercise, the well-defined and straightforward rules of Florida law tip the scales in favor of applying Florida's compensatory damages scheme to this case. Indeed, this case serves as an ideal example of how this factor, as contemplated by the Restatement itself, can assume particular significance when the tremendous expenditures of time and resources necessary to interpret and apply an interested jurisdiction's law would exact a significant toll on the parties as well as the court.

For these reasons, we conclude that the district court correctly determined that Florida law governed the compensatory damages to be awarded to Piamba Cortes.

## IV. APPORTIONMENT OF LIABILITY

American next argues that the district court erred by refusing to apply Florida's comparative fault statute, which directs courts to apportion liability for noneconomic damages according to fault.[26] According to American, although the Warsaw Convention contains no express language providing for apportionment of liability, Article 17's broad language on the issue of damages acts as a "pass-through" to local law and thus requires the application of Florida's apportionment statute. The district court rejected this argument, holding that the overall scheme of liability created by the Convention obliges the air carrier to be liable for all damage sustained by a passenger. *In re Crash Near Cali,* 985 F.Supp. at 1153.

American's claim requires us to determine whether the district court properly construed the terms of the Warsaw Convention, which is a question of law that we review *de novo. See Yapp v. Reno,* 26 F.3d 1562, 1565 (11th Cir.1994).

Article 17 of the Warsaw Convention provides that an air carrier "shall be liable for damage sustained in the event of the death or wounding of a passenger." Warsaw Convention art. 17. The plain meaning of the text suggests that the carrier bears liability for the damages suffered by its passengers; a contrary interpretation that the carrier is liable for damage *for which it alone is responsible,* or for damage *caused by no other tortfeasor,* inserts words and inferences into the text when it is not clear that such additions are intended.

An examination of the surrounding provisions supports this interpretation. Article 21, for example, adopts a comparative liability standard if actions taken by the injured passenger caused or contributed to the passenger's damages. Warsaw Convention art. 21. Article 20 provides that the carrier is absolved from liability if it can prove that it took "all necessary measures" to avoid the damage. *Id.* art. 20. These

---

[26]The district court concluded that, because Florida's apportionment statute does not apply to this case, the court did not need to address conflict-of-laws issues related to the application of a state apportionment statute. We reach the same conclusion on appeal.

provisions suggest that the drafters expressly contemplated when a carrier's liability should be reduced based on the conduct of others;  if the drafters intended to reduce further the carrier's liability based on the conduct of other tortfeasors, they would have added such a provision.

Our conclusion is not altered by the Supreme Court's holding in *Zicherman.*  In that case, the Court concluded that, because Article 17 uses only the term "damage," the issue of compensation for one's injuries is unresolved by the Convention and is governed by the law of the forum jurisdiction.  *See Zicherman,* 516 U.S. at 229, 116 S.Ct. at 636.  The Court restated this position in *Tsui Yuan Tseng,* observing that "[the] Warsaw drafters intended to resolve whether there is liability, but to leave to domestic law (the local law identified by the forum under its choice of law rules or approaches) determination of the compensatory damages available to the suitor."  --- U.S. at ----, 119 S.Ct. at 672.  The comparative fault regime urged by American goes beyond the issue of the amount of damages available to the suitor;  it acts to limit the *liability,* or fault, of the air carrier.  *See* Fla. Stat. Ann. § 768.81(3) ("the court shall enter judgment against each party liable on the basis of such party's percentage of fault").  Under this system, if a defendant and a nonparty each are found to be fifty percent at fault for a plaintiff's injury, the defendant is liable only for fifty percent of the plaintiff's damages.  *See Fabre v. Marin,* 623 So.2d 1182, 1187 (Fla.1993), *receded from on other grounds, Wells v. Tallahassee Mem. Reg'l Med. Ctr., Inc.,* 659 So.2d 249 (Fla.1995).  Application of Florida's comparative fault regime thus would intrude upon the determination of an air carrier's liability for a passenger's injuries, which the Supreme Court recognized is governed exclusively by the terms of the Convention.[27]

Our decision will not require American to pay more damages than the amount for which it is responsible.  Florida, like most other jurisdictions, has recognized a right of contribution on behalf of a tortfeasor who pays for the wrongdoings of additional tortfeasors.  *See* Fla. Stat. Ann. § 768.31 (1997); *see*

---

[27]American cites *In re Crash Disaster Near Cerritos, California, on August 31, 1986,* 982 F.2d 1271 (9th Cir.1992), to support its argument that liability has been apportioned in a Warsaw Convention context before.  We note that the procedural context in which the *Cerritos* court apportioned liability is far from clear in the opinion.  At any rate, the issue of whether liability may be apportioned under the Warsaw Convention was not before the *Cerritos* court, and we therefore do not find the case to be persuasive authority on this issue.

*also* Restatement (Second) of Torts § 886A (1982 App.) (noting that, by 1982, eighty percent of states had recognized right of contribution). American thus is able to pursue a separate cause of action, independent of the Warsaw Convention, against other potential tortfeasors that contributed to the passenger's injuries. *See West Am. Ins. Co. v. Best Prods. Co.,* 541 So.2d 1302, 1304 (Fla.Ct.App.1989) (a cause of action for contribution against a joint tortfeasor exists by virtue of a right and remedy created by statute); *cf.* Restatement (Second) of Torts § 886A(2) (1977) (right of contribution arises after one tortfeasor has discharged more than his equitable share of common liability). Indeed, American has filed precisely such an action related to the crash of Flight 965.

For these reasons, we conclude that the district court correctly rejected American's request to apportion liability according to Florida law.

## V. ADMISSION OF FACTS SURROUNDING CRASH DURING DAMAGES TRIAL

Piamba Cortes has filed a cross-appeal in which she argues that the district court erred by preventing any reference during the trial on damages to the factual circumstances surrounding the crash. Piamba Cortes claims these facts are relevant to the determination of compensatory damages for mental pain and suffering. Moreover, Piamba Cortes contends that, for the same reason, the jury should have been informed of the legal determination that the pilots of Flight 965 engaged in willful misconduct resulting in the crash.

The district court held that "[c]ounsel will not be permitted to make any reference in voir dire, opening statements, testimony, or closing argument to ... [the court's] finding of willful misconduct against American." SR-602-4. The district court later clarified its ruling during the following colloquy with counsel:

> THE COURT: Counsel will not be permitted to make any reference during the course of the trial in opening statement or otherwise to the finding ... of willful misconduct against American Airlines. You may tell them, as the Court will tell them, that the issue of liability has been settled, the only issue in this matter is the matter of damages....
>
> ....
>
> MR. PARKS: You have no problem, as I understand it, though, of us giving a brief overview, that the airplane crashed, without going into the facts of the case?
>
> THE COURT: Without going into the facts. I am going to tell them the airplane crashed when I begin my voir dire.

MR. PARKS: Yes, sir.

THE COURT: But, in any event, no details about conduct, all right?

MR. PARKS: I understand that. And we do object to it but thank you.

SR-7-9-10.

We review a district court's ruling on the admissibility of evidence for abuse of discretion, and evidentiary rulings will be overturned only if the moving party establishes that the ruling resulted in a "substantial prejudicial effect." *Judd v. Rodman,* 105 F.3d 1339, 1341 (11th Cir.1997). When applying an abuse of discretion standard, "we must affirm unless we at least determine that the district court has made a 'clear error of judgment,' or has applied an incorrect legal standard." *SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 77 F.3d 1325, 1333 (11th Cir.1996) (citation omitted).

The admissibility of evidence in a federal action is governed by the Federal Rules of Evidence, not state law. *See Heath v. Suzuki Motor Corp.,* 126 F.3d 1391, 1396 (11th Cir.1997). Nonetheless, state law may assist in defining what evidence is material to an issue, and we previously have relied upon Florida authority when identifying evidence that is material to a determination of damages under Florida's wrongful death statute. *See Hiatt v. United States,* 910 F.2d 737, 743 (11th Cir.1990). In light of the absence of federal law on this issue, we will look to Florida law for guidance.[28]

Florida law provides that, when computing damages for pain and suffering endured by a *plaintiff,* "[i]n most instances ... evidence describing the details of an accident is logically relevant and admissible, even where liability has been admitted, to place the extent of injuries suffered by the plaintiff, as well as the degree of pain endured, in the proper context." *White v. Westlund,* 624 So.2d 1148, 1152 (Fla.Ct.App.1993). The admissibility of such evidence in a wrongful death action brought by a *survivor* of the decedent is not as clear. Damages for such mental pain and suffering, among other things, "must bear some reasonable relation to the facts" of the case. *See Florida Dairies Co. v. Rogers,* 119 Fla. 451, 161 So. 85, 88 (1935) (petition for

---

[28]At any rate, Florida evidence law governing the relevance of and prejudice created by evidence is essentially the same as the Federal Rules of Evidence. *See Brown v. State,* 719 So.2d 882, 887 (Fla.1998) (observing that § 90.403 of Florida's Evidence Code, which governs the admissibility of evidence when it presents the risk of prejudicing a party, "is in essence a restatement of Federal Rule [of Evidence] 403").

re-hearing).  On at least one occasion a court has admitted evidence depicting an accident scene to establish the survivor's damages for mental pain and suffering, although the court also excluded a graphic photo of the decedent because its probative value was outweighed by the danger of unfair prejudice.  *See Johnson v. Florida Farm Bureau Cas. Ins. Co.,* 542 So.2d 367, 370 (Fla.Ct.App.1988).  Given this law, American posits, and we agree, that Florida law may permit the introduction of facts underlying a fatal accident to establish a survivor's pain and suffering but does not require that such evidence be admitted under all circumstances.  *Cf. White,* 624 So.2d at 1152 (facts underlying accident usually are relevant, but "the extent of information that may be received in evidence will vary depending upon the circumstances of each case").

In this case, the district court excluded not only any reference to the legal finding that the pilots of Flight 965 engaged in willful misconduct prior to the crash, but also any evidence relating to the facts of the crash.  Although it appears that the evidence relating to the facts of the crash may have been admissible under Florida law, we cannot conclude that the district court's decision to exclude this evidence constitutes an unreasonable balancing of the probative value of this evidence with its potential for undue prejudice.  As for Piamba Cortes' request to inform the jury of the legal finding of willful misconduct, this action undoubtedly would have unduly prejudiced American when compared to the value of this information in determining compensatory damages.  Consequently, the district court did not abuse its discretion in excluding the evidence.

## VI. CONCLUSION

For the reasons set forth in this opinion, we VACATE IN PART the district court's entry of summary judgment on the issue of American's liability, and REMAND the case for further proceedings consistent with this opinion.  We AFFIRM the district court's determination that Florida compensatory damages law governs Piamba Cortes' claims, that Florida's comparative fault statute is not applicable to this case, and that evidence relating to the facts of the crash may be excluded during a trial to determine Piamba Cortes' compensatory damages.